IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| IN RE THE SEARCH OF 31 ELECTRONIC DEVICES | Case No. 1:24-mj-252-01-TSM |

**AFFIDAVIT OF SPECIAL AGENT CHRISTOPHER DOLAN IN SUPPORT OF AN APPLICATION FOR SEARCH WARRANTS**

I, Special Agent Christopher Dolan, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent with Homeland Security Investigations (HSI) and have been employed by HSI since June 2010. I am currently assigned to the HSI Boston Field Office, Cyber Crimes Group. I have attended the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia where I graduated from both the Criminal Investigator Training Program (CITP) and the Immigration and Customs Enforcement Special Agent Training (ICESAT) program, whereby I was provided formal training in multiple disciplines including money laundering, narcotics trafficking, and fraud investigations. I have a dual bachelor's degree in Criminal Justice and Sociology and a master's degree in Political Science.

2. In connection with my official duties, my investigations have involved the use of surveillance techniques and the execution of various search, seizure, and arrest warrants. I have investigated and assisted other agents in numerous cases involving a wide variety of criminal violations including narcotics trafficking, money laundering, illegal importation of goods, bank fraud, and wire fraud. Based on my training and experience, I am familiar with the methods used by money launderers, including laundering proceeds that are part of large-scale organized schemes. I have received specialized training regarding investigative techniques, evidence collection, and evidence preservation. I communicate constantly with other agents, law

enforcement officers, and intelligence analysts in both the private sector and the government to learn new information about current trends and activities associated with money laundering and fraud schemes.

3. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws.

4. As an HSI Special Agent, I am authorized to investigate violations of the laws of the United States, including violations of 18 U.S.C. § 1030 (Fraud and related activity in connection with computers); 18 U.S.C. § 1029 (Fraud and related activity in connection with access devices); 18 U.S.C. § 1343 (Wire fraud); 18 U.S.C. §§ 1956, 1957 (money laundering), and 18 U.S.C. § 371 (conspiracy) (together, the "Target Offenses").

5. The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents, police officers, and other witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

6. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—specifically, multiple electronic devices described below and in Attachments A-1 through A-31—which are currently in law enforcement's possession and the extraction from that property of electronically stored information described in Attachment B.

7. As an overview, unknown individual(s) obtained access to a computer system maintained by [redacted]. (hereinafter "Victim Company"[1]) and caused the issuance of more than 15,000 electronic gift cards (with nominal value of over $5 million) for various retail companies. While many of these electronic cards were canceled before their value was used, the unknown individual(s) were able to use approximately 4,630 cards worth just over $425,000. The electronic gift cards were initially transmitted via four email accounts. It appears that the fraudulently issued cards were then disseminated and used at retail establishments such as Target, Lowes, and Sephora. The cards were used across the country, primarily on October 18 and 19, 2023. There is probable cause to believe that some of these gift cards were disseminated to and used by a group of individuals in the District of New Hampshire who were part of a larger conspiracy to use thousands of stolen/fraudulently obtained gift cards to purchase electronic equipment and other items of value, sell those items around the country and the world, and to launder the proceeds from this scheme. The TARGET DEVICES, described in Attachments A-1 through A-31, have been seized by law enforcement through the course of other investigations, and there is probable cause to believe that these TARGET DEVICES are evidence, fruits, and/or instrumentalities of the Target Offenses that occurred in the District of Massachusetts involving the Victim Company.

**IDENTIFICATION OF THE TARGET DEVICES**

8. The property to be searched is the following 31 digital devices (collectively, the "TARGET DEVICES") as described more fully in Attachments A-1 through A-31 and incorporated herein by reference:

---

[1] The identity of the Victim is known to law enforcement and is anonymized here to preserve the Victim's privacy.

i. Ming Dong CHEN's (M. CHEN) Apple iPhone in a Gold colored case, XVWL2F7HRW (Target Device 1, see ¶¶ 46, 51-57, 67[2]). Target Device 1 is further described in Attachment A-1.

ii. Ming Dong CHEN's blue Apple iPhone, S/N MCFG24XFV0 (Target Device 2, see ¶ 49). Target Device 2 is further described in Attachment A-2.

iii. Mengying JIANG's silver-colored Lenovo laptop, S/N: MP2L6KMA (Target Device 3, see ¶¶ 59-61). Target Device 3 is further described in Attachment A-3.

iv. Mengying JIANG's white Apple iPhone in a purple case, S/N: G0NF63MC0D45 (Target Device 4, see ¶¶ 61, 66-73). Target Device 4 is further described in Attachment A-4.

v. A black MSI Gaming Laptop, S/N GP72QF495USK1603000445 (Target Device 5, see ¶ 61). Target Device 5 is further described in Attachment A-5.

vi. A white Apple iPhone in a case with a dog pictured on it, S/N: D4NR6G39KK (Target Device 6, see ¶¶ 63, 103-123). Target Device 6 is further described in Attachment A-6.

vii. A white iPhone in a black case (Target Device 7, see ¶ 63). Target Device 7 is further described in Attachment A-7.

---

[2] Paragraph references are provided concerning the seizure of each device to assist the Court in its review for each device. In so doing, the affiant is not limiting the assertion that there is probable cause for the requested searches to simply those paragraphs.

viii. A silver Alienware laptop, model number P120F003 (Target Device 8, see ¶ 63). Target Device 8 is further described in Attachment A-8.

ix. A Samsung Phone with a white case, S/N: R3CW10WQ3JM (Target Device 9, see ¶ 63). Target Device 9 is further described in Attachment A-9.

x. Jinbin REN's white Apple iPhone, S/N: G6TFC3QM0D85 (Target Device 10, see ¶ 83). Target Device 10 is further described in Attachment A-10.

xi. HP Desktop Computer Tower, S/N: 2MO3301RL9 (Target Device 11, see ¶¶ 84-85). Target Device 11 is further described in Attachment A-11.

xii. A white Apple iPhone in a gold animal case, S/N: TFY3257YL6 (Target Device 12, see ¶ 85). Target Device 12 is further described in Attachment A-12.

xiii. A white Apple iPhone (Target Device 13, see ¶ 86). Target Device 13 is further described in Attachment A-13.

xiv. An Apple iPhone in a clear colored case, (Target Device 14, see ¶ 86). Target Device 14 is further described in Attachment A-14.

xv. A grey colored UMIDIGI cellphone, IMEI: 353479104000699 (Target Device 15, see ¶ 86). Target Device 15 is further described in Attachment A-15.

xvi. A blue USB device (Target Device 16, see ¶ 86). Target Device 16 is further described in Attachment A-16.

xvii. A blue USB device (Target Device 17, see ¶ 86). Target Device 17 is further described in Attachment A-17.

xviii. A blue USB device (Target Device 18, see ¶ 86). Target Device 18 is further described in Attachment A-18.

xix. A blue USB device (Target Device 19, see ¶ 86). Target Device 19 is further described in Attachment A-19.

xx. A silver HP laptop (Target Device 20, see ¶ 87). Target Device 20 is further described in Attachment A-20.

xxi. An Apple iPhone (Target Device 21, see ¶ 87). Target Device 21 is further described in Attachment A-21.

xxii. An Apple iPhone in a mint green case (Target Device 22, see ¶ 88). Target Device 22 is further described in Attachment A-22.

xxiii. An Apple iPhone in a blue case (Target Device 23, see ¶ 88). Target Device 23 is further described in Attachment A-23.

xxiv. An Apple iPhone in a blue case (Target Device 24, see ¶ 88). Target Device 24 is further described in Attachment A-24.

xxv. A gold Dell laptop (Target Device 25, see ¶ 88). Target Device 25 is further described in Attachment A-25.

xxvi. A dark colored Asus laptop (Target Device 26, see ¶ 90). Target Device 26 is further described in Attachment A-26.

xxvii. A dark colored Asus laptop (Target Device 27, see ¶ 90). Target Device 27 is further described in Attachment A-27.

xxviii. A white Apple iPhone, S/N: M6QHH7DQYQ (Target Device 28, see ¶¶ 98-99). Target Device 28 is further described in Attachment A-28.

xxix. Naxin WU's silver iPhone in a clear case, IMEI: 359719534660500, S/N: CXJR9JN4JM (Target Device 29, see ¶ 129). Target Device 29 is further described in Attachment A-29.

xxx. Mengying JIANG's white Apple iPhone in a grey case (Target Device 30, see ¶ 130). Target Device 30 is further described in Attachment A-30.

xxxi. Mengying JIANG's black iPhone with a cracked screen, S/N: DNPY12KTKXKN (Target Device 31, see ¶ 130). Target Device 31 is further described in Attachment A-31.

9. The TARGET DEVICES are all currently in the possession of HSI and are stored at HSI's Manchester office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

10. As further described below, I believe there is probable cause that M. CHEN, Xiang Zhong CHEN (X. CHEN), JIANG, WU, REN, and others known and unknown have committed, are committing, and will continue to commit the Target Offenses as beneficiaries of the unauthorized cyberattack on the Victim Company. I also believe there is probable cause that M. CHEN, X. CHEN, JIANG, WU, REN, and others used the TARGET DEVICES to commit the Target Offenses and that the TARGET DEVICES will contain evidence of those crimes.

11. The applied-for warrants would authorize the forensic examination of the TARGET DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE TO BELIEVE A CRIME HAS BEEN COMMITTED

*Cyberattack on Victim Company*

12. Beginning in October 2023, HSI New England received information from the Victim Company that it had experienced a cyberattack during which someone used an external internet connection to make unauthorized access into the Victim Company's internal customer

service system. Additional information indicates that the bad actor(s) used their access to fraudulently issue electronic gift cards. More than 15,000 gift cards were issued for retail businesses including, but not limited to, Target, Lowe's, and Sephora. These electronic gift cards were delivered to multiple email addresses.

13. During this investigation, investigators have had multiple meetings with the Victim Company. The Victim Company is an office supply company headquartered in Massachusetts. The Victim Company sells its products through physical retail locations, its website, and over the telephone.

14. The Victim Company maintains a data center in Massachusetts and uses Nexus, a data entry platform, for customer service representatives to place orders received from customers. The fraudulent orders in this cyberattack passed through Nexus and were then recorded in the Victim Company's shared order management system (SOMS).

15. The Victim Company also sells electronic gift cards that can be used at retail locations such as Target, Lowe's, and Sephora. These electronic gift cards are fulfilled by another company, Blackhawk Network, which is headquartered in Pleasanton, CA. When an electronic gift card is purchased, a link is sent to the customer's provided email address that allows the customer to activate and use the gift card.

16. A customer of the Victim Company may purchase an electronic gift card in several ways, including by using the Victim Company's website or contacting a customer service agent (by telephone or through an electronic chat). When an order is placed it is funneled for processing into Shared Order Management System (SOMS). Before an order is fulfilled, other computer systems run fraud verification to ensure, for example, that the customer has funds to pay for the order or that the order is not fraudulent. One of these fraud verification systems is called Kount.

The fraud determination is based on several factors such as a comparison of the shipping, billing, and IP addresses associated with the order.

17. On approximately October 18, 2023, the Victim Company identified a higher-than-normal volume of electronic gift card purchases. On October 19, the Victim Company reviewed the suspicious orders in Kount, which showed that the orders were flagged as fraudulent and declined. However, despite being declined in Kount, SOMS showed the orders were ultimately fulfilled. According to the Victim Company, there should not be this type of discrepancy between Kount and SOMS records, which led to an internal investigation.

18. The Victim Company discovered that the gift card orders originated from Nexus. The Victim Company believed that access to Nexus was limited to computers on the company network, but the perpetrator(s) were able to access this system from external computers. The Victim Company believes that the perpetrator(s) made it appear that their external computers were authenticated on the Victim Company's network.

19. The Victim Company Computer records indicate that to obtain access to Nexus, the perpetrator(s) performed multiple "heap dump" requests. A "heap dump" is a way to capture all objects in memory at a particular time. Using the information obtained from these heap dumps, the perpetrator(s) are believed to have hijacked/mimicked sessions of logged-in customer service representatives to execute the fraudulent gift card orders.

20. Once inside the Victim Company systems the perpetrator(s) generated orders for more than 15,000 electronic gift cards worth approximately $5 million to various retailers. The Victim Company determined that the perpetrators manipulated the information associated with the orders, including the price and payment information for the electronic gift cards. For example, order number 9419465246, placed on October 18, 2023, was an order for 2,000 Target electronic

gift cards valued at $200.00 apiece. The price per item had been manipulated by the perpetrator(s) to reflect a sale price of $0.01 per gift card, for a total order value of $20. The records indicated that the payment type for the order was a gift card, but the gift card number provided was later determined to be invalid and not a real gift card number with any value. Furthermore, the Victim Company stated that they do not allow gift cards to be purchased with other gift cards to prevent money laundering. Despite there really having been no payment, the orders bypassed the "awaiting payment hold" and other fraud holds, allowing the orders to ship. The electronic gift cards were sent to email accounts selected by the perpetrator(s) of the attack. Additionally, the perpetrator(s) executed or attempted to execute test orders that were later linked to certain email accounts. In March 2024, investigators applied for and obtained search warrants from the U.S. District Court for the District of Massachusetts for four email accounts that either received the fraudulent e-gift cards or were associated with test orders by the perpetrator(s):

- KENCOMPUTERSINC@OUTLOOK.COM;
- HOLSTEINGAMING@OUTLOOK.COM;
- RONTECHINCORP@OUTLOOK.COM; and
- JOSEFTECHANDCO@OUTLOOK.COM. *See* 24-mj-4140, -41, -42, and -43 (Hennessey, J.)

21. HSI agents worked with the Victim Company to investigate the attack. Subsequent information provided from the Victim Company and other retailers revealed that multiple individuals in the U.S. rapidly used the stolen electronic gift funds over the course of October 18 and 19, 2023.

22. For example, Target provided documentation to investigators that approximately 3,850 fraudulently obtained electronic Target gift cards, totaling approximately $141,000, were

redeemed in person over the course of 300 transactions at 85 Target retail locations in 18 states on those two days. Documentation from Sephora revealed that approximately 330 fraudulently obtained electronic Sephora gift cards, totaling approximately $58,600, were redeemed online over the course of approximately 1,500 transactions with order shipments to five U.S. states and two Canadian provinces. Lowe's provided documentation that approximately 450 fraudulently obtained electronic Lowe's gift cards, totaling approximately $226,000, were redeemed both online and in person, over the course of 185 transactions, at over 22 Lowes locations in nine states.

*Use of Gift Cards from Cyberattack in the District of New Hampshire*

23. As relevant here, Target provided information that 35 fraudulently issued gift cards originating from the Victim Company cyberattack, each with a value of $200 (totaling $7,000), were used in-person at a Target retail store located at 203 S Broadway, Salem, NH on October 19, 2023. The 35 gift cards were used over 11 transactions to purchase approximately 38 Apple, Bose, and Powerbeats products at the same register in the electronics department in successive transactions over the course of approximately one hour. Further analysis of the 11 transactions revealed that the total amount for the transactions was $12,356.65 and were conducted using both the fraudulently-obtained electronic Target gift cards and many other electronic and physical Target gift cards to make purchases. The origin of the additional gift cards used is yet to be determined.

24. Surveillance video provided by Target revealed that four Unidentified Asian Males (UAMs) made the purchases. Three of these individuals were subsequently identified as Ming Dong CHEN (DOB [redacted]1996, Chinese Passport [redacted]) who resided [redacted] in Nashua, NH (hereinafter M. CHEN); Mengying JIANG (DOB [redacted]1990, NY DL [redacted]) who resided [redacted] in Nashua, NH (hereinafter

JIANG); and Xiang Zhong CHEN (DOB: [redacted]1976, NY DL [redacted], last known address [redacted] Flushing, NY (hereinafter X. CHEN).

25. The 11 Target transactions, totaling $12,356.65, are detailed below:

| Transaction # | Total Amt. | Gift Cards From Victim Company Cyberattack | No. Of Cards Used | Subject |
|---|---|---|---|---|
| 3292-1186-0114-9007 | $698.99 | 3 totaling $498.99 | 11 | M.CHEN |
| 3292-1186-0114-9008 | $779.98 | 3 totaling $505.01 | 5 | M.CHEN |
| 3292-1186-0114-9010 | $1,419.95 | 8 totaling $1,419.95 | 8 | X.CHEN |
| 3292-1186-0114-9011 | $749.97 | 3 totaling $580.05 | 5 | X.CHEN |
| 3292-1186-0114-9012 | $1,498.97 | 3 totaling $552.33 | 15 | UAM |
| 3292-1186-0114-9013 | $1,579.96 | 5 totaling $774.96 | 25 | UAM |
| 3292-1186-0114-9014 | $979.97 | 2 totaling $83.31 | 17 | UAM |
| 3292-1186-0114-9015 | $979.97 | 3 totaling $524.90 | 7 | UAM |
| 3292-1186-0114-9016 | $979.97 | 1 totaling $64.43 | 5 | JIANG |
| 3292-1186-0114-9017 | $1,528.96 | 3 totaling $1,400.00 | 8 | JIANG |
| 3292-1186-0114-9018 | $1,159.96 | 3 totaling $600.00 | 5 | JIANG |

26. All four men were recorded appearing one after another, occasionally interacting with one another and the cashiers. In every transaction, the same repeated payment behavior was observed on the surveillance footage. M. CHEN, X. CHEN, JIANG, and the UAM each presented their cell phones to the Target cashier allowing the cashier to scan the electronic Target gift card displayed on their respective cell phones. After an electronic gift card was scanned, all four would use their phone, appearing to access another electronic gift card and presenting it to the cashier to be scanned.

27. This pattern was repeated in each transaction until it appeared each male exhausted the remaining electronic gift card inventory available on their phones. The below photos are of the four individuals conducting the transactions using their cellphones on October 19, 2023.



M. CHEN X. CHEN JIANG UAM

28. Once the electronic gift cards were used, the males would then use physical gift cards. M. CHEN, X. CHEN, JIANG, and the UAM were all also observed handling a physical Target gift card and handing it directly to the Target cashier to be scanned.

29. On or about December 18, 2023, HSI agents began communicating with the Asset Protection team at the Salem, NH Target. Target reported that the four males who made the 11 purchases on October 19, 2023, were well known to employees and came into the store almost every day to make numerous large purchases of Apple products using gift cards. Additionally, if products they were looking to purchase were not available, they would purchase other expensive items and often return them, getting credit on new gift cards. This way, the four males used Target merchandise to transfer the balance of their gift cards to different gift cards.

30. On December 19, 2023, agents received information from the Salem, NH Target Asset Protection team that one of the four individuals (a specific individual was not identified) from the October 19, 2023 purchases, was in the store that evening purchasing electronic products and that the individual was driving a silver Toyota 4-Runner with NY plate KFV 5029. A query of a law enforcement database revealed this license plate belonged to a grey 2007 Toyota 4-Runner that was registered to X. CHEN.

31. Based upon my training and experience, conversations with other law enforcement, and knowledge of other law enforcement investigations, I believe this activity was consistent with a common tactic utilized in Organized Retail Crime (ORC)—specifically, exploiting the use of stolen and or fraudulently obtained gift cards to make purchases of various high-priced merchandise, such as Apple products. This merchandise is then in turn sold to others in the United States or abroad. The end-purchaser(s) of these devices typically have no knowledge of the original fraud. The proceeds generated from the final sale of the electronics to the consumer obfuscates the origin of the illegally obtained funds used to purchase the merchandise.

32. While there are varying levels of sophistication and methods of conducting these scams, one such method involves the coordinated efforts of entering a retail establishment and removing hundreds, if not thousands, of inactive gift cards from their display racks and discretely leaving the store with them. The gift card number, PIN number, and other pertinent information are recorded into a computer program that repeatedly checks the retailer's website to determine when a customer makes a legitimate purchase of the compromised card by adding money to it. The card is then subsequently either repackaged or restored to its original condition and brought back to a retail establishment and placed back on the shelves for sale.

33. At this point, an unsuspecting customer will select a gift card off the shelf, add funds to it at checkout, and leave the store. Once the program tips off the fraudster that the gift card has been loaded with money, the card details are either used in an online purchase or electronically disseminated to co-conspirators who are sent to make in person purchases at retail locations. The original physical gift card is not necessary for use by co-conspirators as the pertinent information has been obtained and can be transmitted to other co-conspirators' electronic

devices, such as cell phones. High value electronic items such as Apple iPads, iPhones, and computers are often purchased and brought back to a central location for distribution and resale.

34. Another method utilized in these schemes involves the utilization of stolen funds or proceeds of illicit activity to purchase physical or electronic gift cards. These gift cards are then used online or disseminated to individuals who are sent to make purchases online or at physical retail locations. This is a form of money laundering, as the gift cards conceal the source of the illicitly obtained funds. It is believed that the use of gift cards will raise less suspicion than making large volume purchases of high-value electronic items using bulk currency. Similarly, by using gift cards, fraudsters can avoid using credit cards which would need to be linked to an actual identity. The individuals who make the retail purchases using the gift cards are paid a small sum of money, often for each device that they turn over to the organizer(s) of the scheme.

*Identification of NH Individuals and Their Involvement in Extensive Gift Card Schemes*

35. On December 28, 2023, the Concord, NH Police Department received a complaint from a resident in Alabama who claimed that he was a victim of a gift card theft after a gift card that was purchased in Alabama was subsequently used at a Concord, NH Walmart store without his permission.

36. The Concord Police Department began working with Walmart's loss prevention unit. I have reviewed a search warrant affidavit and police reports submitted by the Concord Police Department who investigated that incident. According to the affidavit and reports, Walmart Loss Prevention provided video surveillance associated with the fraudulent transaction showing a young Asian male involved in the transaction and driving a white Mercedes sedan with New York Registration Number KZH8797. According to the affidavit and reports, that vehicle was registered to M. CHEN of Brooklyn, NY. Walmart Loss Prevention had previously identified this individual

after initiating an investigation into M CHEN and other individuals conducting suspicious transactions for purchasing large quantities of high value electronics with electronic and physical gift cards that were suspected to be stolen or fraudulently obtained. Walmart had determined that M. CHEN had been to not only the Concord, NH Walmart but also a Walmart in Tilton, NH several times.

37. Throughout the course of physical and electronic surveillance conducted by Walmart Loss Prevention, other individuals were observed travelling with M. CHEN to Walmart locations to conduct the suspected fraudulent purchases. Walmart Loss Prevention identified associate JIANG by name when he used a credit card in his own name while paying for a transaction at a Sam's Club, a division of Walmart Inc. Walmart Loss Prevention surveillance also observed vehicle(s) that M.CHEN and associates were utilizing when arriving and departing the Walmart parking lots to conduct transactions with gift cards, including a Toyota 4Runner, with NY license plate KFV5029, registered to X. CHEN. This was the same license plate provided by Target Asset Protection on or about December 19, 2023, as being utilized by the UAM, M.CHEN, X.CHEN, and JIANG group that night (described above in ¶ 30).

38. On December 29, 2023, at approximately 5:52 p.m., Concord police officers observed M. CHEN and his white Mercedes in the parking lot of the Concord, NH Walmart. M. CHEN was temporarily detained. Officers observed Apple iPads in their original packaging in the rear seat of the vehicle. The iPads appeared to be in plastic shopping bags, one of which was clearly distinguishable as a Target bag due to the red “bullseye” logo on it.

39. M. CHEN’s vehicle and cell phone were seized pending an application for a search warrant. M. CHEN was informed that he was free to leave via Google translate as M. CHEN had

a difficult time communicating in English. Once M. CHEN was advised that he was free to leave, a detective used Google translate to ask if he would be willing to speak with him.

40. According to a search warrant affidavit submitted by the Concord Police detective, M. CHEN indicated he wanted to speak with officers. The affidavit indicates that it was dark, cold, and raining that evening and M. CHEN did not have a ride to the police department as his vehicle was seized pending an application for a search warrant, so he agreed to a courtesy ride from the Concord Police from the Walmart to the Concord Police Department. M. CHEN was driven to the front of the Concord Police Department onto the sidewalk in front of the Police Department and waited in the lobby by himself for approximately 10-15 minutes before being asked if he still wished to voluntarily speak to the Concord Police, to which he stated that he did.

41. According to a search warrant affidavit submitted by the Concord Police detective, M. CHEN was brought to an interview room where a telephonic Mandarin Chinese interpreter available to the Concord Police Department was arranged. The interpreter was present for the entirety of the recorded interview. M. CHEN was asked and agreed to the interview being audio recorded. It was reiterated to M. CHEN that he was not in custody, under no obligation to speak to the Concord Police or answer any questions, and was free to leave at any time that he wished. M. CHEN was told that if he wanted to leave, a detective would immediately escort him back to the lobby. M. CHEN chose to voluntarily speak.

42. M. CHEN stated that he moved to the United States from China eight years ago and that he worked for a sushi restaurant in the past. M. CHEN stated that he currently had a girlfriend but that that he lived alone in an apartment in New York.

43. M. CHEN claimed to have been to New Hampshire approximately five times previously and that he comes to New Hampshire to purchase merchandise with gift cards because

there is no sales tax. Additionally, purchasing merchandise with the gift cards was his only form of employment. M. CHEN stated that when he comes to New Hampshire from New York to make the purchases, he stays for about three days at a time and sleeps inside of his vehicle at night. M. CHEN stated that he used to work with another person when he made the trips to New Hampshire, but that he now operates alone.

44. M. CHEN stated that he receives a list of gift card numbers from his boss and uses them to make purchases of iPads, Apple Air Pods, Apple Watches, and ink cartridges for printers. Furthermore, he said the gift cards he uses to purchase merchandise belong to his boss and that he did not know his boss's name because he only communicates with him through the Chinese phone messaging application WeChat. M. CHEN stated that he is paid $10.00 per device he purchases. M. CHEN acknowledged that he believed that the gift cards he was using were likely stolen. Specifically, M. CHEN mentioned seeing news stories explaining this type of scam.

45. M. CHEN claimed that once the merchandise was purchased, it either goes back to New York or gets sent to China. M. CHEN stated that he returns to New York with the merchandise he purchased with gift cards, boxes it up, and leaves it outside of a warehouse/office building. Once those items are collected and counted, he is instructed to return the following day to be paid in cash.

46. M. CHEN was unable to recall the location of the merchandise drop point off the top of his head but said that the locations would be contained somewhere on his cell phone (hereinafter, Target Device 1) along with gift card information and communications with his boss and photographs of merchandise.

47. Following the conclusion of the interview, M. CHEN was informed he was free to leave but he replied he had nowhere to go.

48. An officer then obtained documentation indicating that M. CHEN had made several purchases at Walmart locations in Merrimack County earlier in that afternoon using several suspected fraudulent Walmart gift cards. At this point, M. CHEN was placed under arrest.

49. On January 3, 2024, officers searched M. CHEN's Mercedes pursuant to a New Hampshire state search warrant. Inside of the center console, the Concord Police Department discovered a blue iPhone (hereinafter, Target Device 2). They also discovered approximately $20,000 (estimated retail value) in electronics and other retail items inside of the vehicle. These items included large quantities of Apple iPads, Apple Watches, ink cartridges, gaming console items, and a large bundle of Walmart, Target, and Best Buy gift cards.

50. Most of the merchandise was still in shopping bags belonging to their respective retail stores. Most of these bags also contained receipts documenting the purchase of the items. The receipts indicated that many of the purchases were made using multiple gift cards.

51. On January 2, 2024, officers searched M. CHEN's first cell phone (Target Device 1) pursuant to a New Hampshire state search warrant.

52. Officers discovered that M. CHEN relied heavily on WeChat to send text messages, photographs, and videos. Many of the messages contained within Target Device 1 were related to retail gift cards and purchasing electronics. The messages contained gift card numbers, PIN numbers, and often a monetary value of the remaining balance on each card.

53. Target Device 1 also contained photographs of electronic gift cards. It appeared M. CHEN would enter the gift card number and PIN code sent via WeChat into either the Walmart or Target application to make purchases in-store.

54. Following a forensic extraction of Target Device 1, a Concord detective reviewed the device. Within the "Deleted Photos" folder, the detective observed a photograph dated

December 10, 2023. The photograph showed two cardboard boxes with shipping labels attached to them. The shipping labels were labeled: Joe Jiang 18 Harbor Ave 312 Nashua, NH 03060.

55. There was also a video with a date stamp of December 11, 2023. The video depicted a very large quantity of electronic devices in their original retail packaging stacked on the floor. The items varied but appeared to be iPads, Air Pods, and headphones. These items were consistent with the merchandise involved in the organized theft ring that is a subject of this investigation.

56. A photograph dated December 11, 2023, appeared to depict several Target shopping bags on the floor of a room.

57. There was also a message sent through WeChat from M. CHEN that appeared to contain several gift card numbers along with the address of 18 Harbor Avenue Unit #312 in Nashua, NH (hereinafter, 18 Harbor Avenue).

58. On January 4, 2024, a New Hampshire court granted a warrant to search 18 Harbor Avenue, which is a two-bedroom apartment. Law enforcement located two occupants inside, JIANG and Naxin Wu (DOB: [redacted]1998) (hereinafter WU).

59. During the initial search of the apartment, a silver-colored Lenovo laptop (hereinafter, Target Device 3) was observed powered on with the screen unlocked. The laptop was on a table inside of the living room. The computer had a program running on the screen. An HSI agent used the standard "Translate" App found on iPhones to conduct a preliminary translation of the Chinese writing on the screen.

60. The program appeared to be utilized for the purpose of entering or receiving gift card numbers. A RAM (random access memory) dump and preservation of volatile data was conducted in order to preserve evidence present on the laptop on scene.

61. Several Apple gift cards were located in the living room in the vicinity of Target Device 3. Also located next to Target Device 3 was a white Apple iPhone in a purple case (hereinafter, Target Device 4). A counterfeit Washington state ID card that contained a photograph of JIANG was also located nearby in the living room. Located on the couch nearby Target Devices 3 and 4 was a black MSI gaming laptop (hereinafter Target Device 5). Target Device 5 was found in a "powered-off" status and contained two white "Apple" stickers attached to it. A Concord detective conducted a voluntary, non-custodial, on-scene interview of WU in English. WU stated that Target Device 4 and the items near Target Device 3 belonged to JIANG.

62. While executing the premises search warrant, a package delivery driver from UPS arrived at the apartment with a delivery of 15 packages subsequently discovered to contain 15 iPhones directly from Apple. The UPS delivery driver advised that he makes approximately four deliveries to this address each week, mostly consisting of Apple products.

63. The master bedroom contained almost exclusively female items such as clothing, handbags, cosmetic supplies, and hair accessories. WU stated that this bedroom was hers. Several notebooks were located inside of this room which contained detailed records of transactions made at various retail stores. Several different names were listed on pages with monetary values listed below them by date. This led investigators to believe that these notebooks were used to keep track of individuals making purchases at retail stores. A white Apple iPhone in a case with a dog pictured on it (hereinafter, Target Device 6), a white Apple iPhone in a black case (hereinafter, Target Device 7), a silver Alienware laptop (hereinafter, Target Device 8), and Samsung Phone in a white case, S/N: R3CW10WQ3JM (hereinafter, Target Device 9) were also located in the master bedroom. Additionally, 35 Apple iPhones in their original packaging were located in the master

bedroom closet and 24 Apple iPhones in their original packaging were located hidden in the master bedroom bathroom vanity.

64. A search of the second bedroom revealed a New York motor vehicle title in M. CHEN's name along with a Mercedes key. Additionally, numerous banking documents in M. CHEN's name were also located inside of this second bedroom along with various retail store receipts.

65. Approximately $30,000 in U.S. currency was also located in the apartment along with ledgers containing what appears to be gift card information and transactions.

66. On January 8, 2024, investigators searched JIANG's cell phone (Target Device 4) pursuant to a New Hampshire state search warrant. Target Device 4 was forensically downloaded by the Concord Police Department and analyzed for evidence of criminal activity.

67. A detective reviewed images within the "media" folder of Target Device 4. The detective observed photos of large quantities of Apple products in their original retail packaging, similar to the images uncovered on M. CHEN's Target Device 1 that led investigators to 18 Harbor Avenue.

68. The detective located an image dated August 6, 2023, which depicted a table on a concrete floor containing a large quantity of Apple products including what appeared to be Apple Watches, iPads, and other smaller Apple products in their original packaging.

69. The detective located other images on Target Device 4, dated September 17, 2023, showing additional large quantities of Apple products that appeared to be taken in some sort of industrial setting given the concrete floors and shipping boxes in the background.

70. The detective located an image of a FedEx shipping label, dated September 15, 2023, from "50 A Northwestern Dr Unit 2 Salem, NH 03079" (hereinafter 50A Northwestern

Drive). The sender was "Benson REN," and the addressee was "LOR SIU MING, HOWELL INTERNATIONAL TRADING LIMITED, FLAT 2003, 20/F, N0. 1 HUNG TO ROAD, KWUN TONG." This FedEx shipping label was located within a WeChat conversation that also included the dissemination of gift card numbers.

71. Within the device location history of Target Device 4, the user had saved "50 Northwestern Dr" as a favorite location in Apple Maps.

72. There was also a conversation between JIANG and another unknown individual in JIANG's WhatsApp messages on Target Device 4, dated June 1, 2023, where JIANG stated that 50A Northwestern Drive was a warehouse that could pack up merchandise to be shipped out.

73. Additionally, there was an image of a partial shipping label located on Target Device 4, dated December 4, 2023, addressed to the name "Jack Jin" at 50A Northwestern Drive from A.I., 102 Goodman Drive, Carlisle, PA 17013.[3]

74. On January 8, 2024, the Concord Police obtained a warrant to arrest JIANG.

75. On January 9, 2024, the Concord Police Department and HSI executed a New Hampshire state search warrant at 50A Northwestern Drive. Upon entry of the warehouse, investigators encountered seven individuals working inside, including the owner of the business and renter of the warehouse unit, Jin Bin Ren (DOB: [redacted]1987, MA DL [redacted]) who resides at [redacted]Lynnfield, MA (hereinafter REN).[4]

---

[3] This address is known to investigators as an Apple shipping facility and the same address that was observed on the 15 packages containing 15 Apple iPhones delivered to 18 Harbor Avenue on January 4, 2024.

[4] While conducting a pre-operation briefing, a FedEx truck was observed by surveillance units to be loading dozens of packages on board and was believed to be departing the area shortly. Due to the concern that evidence would be concealed or lost, the decision was made to immediately respond to the target address to execute the search warrant. The FedEx truck began

76. REN was detained in handcuffs on the second floor of the warehouse with the other individuals. From speaking with REN, officers believed he was able to understand and speak English.

77. REN then agreed to speak with officers in private. However, because REN then claimed to not speak English, Concord Police had a Mandarin interpreter available over the telephone.

78. REN was brought into a private room and had his handcuffs removed. REN was read his Miranda rights; however, he did not wish to sign the waiver form. Additionally, while he was willing to be interviewed, he did not want the interview to be recorded.

79. The interpreter was present for the entirety of the non-recorded interview.

80. REN acknowledged that the business belonged to him, and that he was the head of operations. REN stated that he owns a shipping company where his "clients" have their items shipped to him, and he then forwards the items to China.

81. REN stated that he operates specifically in New Hampshire because there is no sales tax. REN stated that he keeps records from his customers in "WeChat" and that he was unaware of the origin of the items that he was shipping. REN said that he did not ask any questions about what was being shipped and that he was paid via cash or had money sent to a Chinese bank account for his services. After further discussion, REN indicated that he suspected he may be assisting individuals involved in illegal activity.

---

to drive away upon law enforcement's arrival. An HSI Unit stopped the FedEx Truck and seized several boxes from it that originated from 50A Northwestern Drive. These boxes were separated from the rest of the evidence so that a subsequent warrant could be obtained to conduct a search of the packages.

82. When asked if he was aware of any of the common gift card scams that have been going around, REN acknowledged that he was aware of them. However, REN has never asked his clients where they get their merchandise from.

83. During the execution of the search warrant, REN was searched, and a white Apple iPhone was located on his person and seized (hereinafter, Target Device 10).

84. A desktop computer was located inside of the front office and observed to be in a "powered-on" condition with several programs opened on a large, curved monitor connected to an HP computer tower (hereinafter, Target Device 11). In plain view, investigators could see the screen connected to Target Device 11 displaying a spreadsheet opened that contained data related to Apple products and other electronics. The spreadsheet appeared to be documenting quantities of these devices. Also, on the screen there were multiple shipping labels displayed.

85. A white Apple iPhone in a gold animal case (hereinafter, Target Device 12) was located on the office desk next to Target Device 11. REN's wallet was located on top of this desk, which contained his identification, credit cards, and other personal effects. Furthermore, several bank checks were located on this desk, most of which were made payable to REN. This office area was the only workstation in the building that appeared to contain financials and other records. Due to this information, officers believe that Target Device 12 belonged to REN.

86. Further search on top of the front office desk and the immediate surrounding area of where Target Devices 11 and 12 were discovered revealed numerous receipts and bundles of physical gift cards and merchandise credit cards to various retail locations, including Lowe's and Walmart; various inventory printouts in both the Chinese and English languages pertaining to Apple products; shipping labels addressed to various recipients in China; approximately $10,000 in U.S. currency; a white Apple iPhone (hereinafter, Target Device 13); an apple iPhone in a clear

colored case (hereinafter, Target Device 14); a grey colored UMIDIGI cellphone, IMEI: 353479104000699 (hereinafter, Target Device 15); and four (4) blue USB devices (hereinafter, Target Devices 16, 17, 18, 19, respectively).

87. A search of a second, smaller office space adjoined to the front main office revealed numerous large collapsible shipping containers filled with various shipping boxes containing electronic merchandise, including Apple products. Additionally, there were bundles of receipts from Lowe's showing purchases funded with gift cards, many of which were made in Massachusetts, as well as printed shipping labels addressed to various recipients in China. Furthermore, a silver HP laptop (hereinafter, Target Device 20) was discovered on top of numerous shipping boxes plugged into the same electrical outlet as a nearby electronic shipping scale. An Apple iPhone (hereinafter, Target Device 21 and marked as Concord Police Department Evidence "24-460-PR") was also discovered plugged into Target Device 20.

88. A search of a small kitchenette located directly outside of the smaller office revealed empty shipping packages from an address known to ship Apple products addressed to 50A Northwestern Drive, numerous physical gift cards from Lowe's, an Apple iPhone in a mint green case (hereinafter, Target Device 22), and two Apple iPhones in blue cases (hereinafter, Target Device 23 (marked as Concord Police Department Evidence "24-455-PR") and Target Device 24 (marked as Concord Police Department Evidence "24-456-PR"), respectively) located on top of a Gold Dell Laptop (hereinafter, Target Device 25).

89. An ensuing search of the premises, specifically the warehouse potion of the business, uncovered thousands of Apple products, including iPhones and iPads, and hundreds of other electronic devices to include printers, copiers, streaming devices, computers, computer

processors, gaming consoles, and headphones. In total, there were **over 7,000 separate electronic items** in their original packaging seized.[5]

90. While searching the warehouse, which contained the majority of all electronic merchandise, two Asus laptops were discovered on either end of the warehouse. In the portion of the warehouse located nearest to the front offices, a dark colored Asus laptop (hereinafter, Target Device 26) was discovered on top of a stack of inventory printouts in both Chinese and English pertaining to Apple products. At the rear portion of the warehouse directly next to the loading dock bay door, another dark colored Asus laptop (hereinafter, Target Device 27) was discovered on a shelf next to several FedEx envelopes containing Lowe's Gift Cards.

91. On January 10, 2024, at approximately 10:00 am, REN and his wife Caihong LIN were observed arriving at the parking lot of 50A Northwestern Drive driving a grey Mercedes Benz, bearing MA license plate 1RNF63. The vehicle parked near the front entrance to the unit 2A door. HSI agents met REN and LIN as they were walking towards the main doors and informed them that the search warrant was still being executed and they would not be able to enter until law enforcement finished their search. During this conversation, REN spoke broken English, but was able to understand and communicate in English without a translator.

92. Agents informed REN and LIN if they urgently needed something inside of the business, such as medicine, law enforcement would retrieve it. REN stated that he did not need anything and just wanted to know when law enforcement would be finishing.

---

[5] Due to the size of the warehouse and quantity of items to be searched, the search warrant was executed over three consecutive days from January 9 until January 11. The premises was secured overnight with the assistance of the Salem Police Department on the nights of January 9 and January 10.

93. Agents informed REN that they did not expect to be finished by the end of the day. They offered to call REN or send an email to him once law enforcement finished and departed the premises. REN stated that law enforcement took all his phones the day before and he had no way to communicate with anyone. REN provided a phone number that he claimed belonged to his brother.

94. Moments later, as REN and LIN began to walk back towards their vehicle, HSI agents heard a cell phone ringing and noticed REN became visibly uncomfortable and agitated. Although he just moments before claimed to not have a phone, it was clear that REN did have a phone on his person and did not want law enforcement to know about it.

95. REN began to nervously make incoherent excuses why he previously said he had no phone. An HSI agent informed REN that it was not illegal to have a phone and to not worry if he did not want law enforcement knowing he had another phone. LIN and REN departed the premises momentarily thereafter.

96. On January 11, 2024, at approximately 7:00 AM, an HSI agent was made aware from Customs and Border Protection (CBP) stationed in Boston, MA, that REN had booked a one-way flight from Boston's Logan Airport to Seoul, South Korea aboard Korean Airlines, flight KE 92, that was due to depart within the next few hours.

97. HSI informed Logan Airport CBP of the search warrant executed at REN's business in New Hampshire and that it appeared REN may be trying to abscond the United States. CBP arranged for an outbound inspection of REN and his belongings to ascertain if REN was attempting to depart the United States with evidence pertaining to the Target Offenses.

98. CBP encountered REN at approximately 10:00 am and conducted an outbound inspection of REN and his belongings just prior to boarding. REN was found to only have a carry-

on bag, a backpack, and a wallet, all of which were found not to contain any evidence of criminal activity. Additionally, REN also had a white iPhone 13 on his person (hereinafter, Target Device 28). When asked about his destination and purpose of travel, REN stated that he was going to China to talk to clients that "shipped stuff to his warehouse for storage." When asked if he had ever been in trouble with law enforcement, REN replied no. During this conversation, REN spoke in English and was able to communicate with and understand the CBP officer.

99. Upon request, Ren provided Target Device 28 to the CBP Officer. As REN handed the CBP officer his phone, it was opened already to text messages. A CBP officer inadvertently hit one of the texts messages which opened a picture of a search warrant. CBP questioned why a search warrant was on the phone after REN just denied any involvement with law enforcement. REN stated that the police searched his warehouse, due to some of "the stuff people send to his warehouse for storage." Target Device 28 was subsequently detained by CBP pursuant to its authority to conduct border searches, including for flights leaving the United States, and REN was provided a receipt for the device and informed it would be mailed to him later.

100. REN was informed that he was free to board his plane and depart. At first REN stated that he wanted to stay and did not want to fly out. REN then changed his mind and boarded his flight. Approximately five minutes later, Korean Airlines notified CBP that they must deboard the plane because REN did not feel comfortable on the flight and wished to get off.

101. CBP returned to the departure gate to talk to the flight manager. REN was the first person to deboard the plane and stated to CBP that he did not feel comfortable on the plane and wished to go back to his house. CBP explained to REN that he was not in custody or being detained and that he was free to leave. REN exited the departure gate with no further incident.

102. Later that evening on January 11, 2024, HSI learned that REN booked a flight on Cathay Pacific Airlines, flight CX 843, out of JFK Airport in New York. On January 12, 2024, at approximately 1:35 AM, REN boarded flight CX 843 to Hong Kong, China without incident.[6]

103. On February 12, 2024, a New Hampshire state search warrant was executed on Naxin WU's earlier-seized cell phone (Target Device 6). Target Device 6 was analyzed for evidence of criminal activity.

104. As a basis for comparison, law enforcement reviewed Walmart receipts that were seized from M. CHEN's vehicle on December 29, 2023. Law enforcement located receipts dated December 29, 2023, which contained the last four digits of the gift cards redeemed. The first gift card listed on one of the receipts ended in 0356.

105. Law enforcement then conducted a search on the forensic extraction on Target Device 6 for "0356." There was a conversation thread located that took place through WeChat on December 13, 2023, which contained a long message containing several Walmart gift card numbers sent by WU.

106. The conversation thread had two other users, identified as JIANG and M. CHEN. Within that thread was a gift card which ended in 0356. The full gift card number was 6309660193040356. Law enforcement provided this gift card number to Walmart Global Investigations. Walmart Global Investigations advised that the gift card ending in 0356 was used in a transaction on December 13, 2023, at the Walmart located at 344 Loudon Rd, Concord, NH.

---

[6] HSI later learned that when REN booked his flight to China from JFK airport, he had also booked a return flight to the United States, via Cathay Pacific Airlines, flight CX 844, from Hong Kong to New York on January 26, 2024. However, REN never boarded that flight.

107. The gift card ending in 0356 was redeemed along with 12 other gift cards to purchase electronic products, totaling approximately $997. Surveillance footage of the transaction provided by Walmart revealed that M. CHEN purchased two iPad 9 devices and a Quest 3 128 GB virtual reality device.

108. Walmart investigated the gift cards used in that transaction and found that they had been purchased not directly through a Walmart retail location, but rather via third party vendor(s) and that several of them were recorded as lost or stolen in the internal Walmart system.

109. Additionally, Walmart identified a separate gift card used in the December 13, 2023, transaction by M. CHEN. Gift card 6306946784834131 was a $500.00 gift card that was purchased at a Walmart store in Spokane, WA on December 12, 2023.

110. Walmart provided receipts and still images from surveillance footage of the gift card purchase in Spokane, WA. The individual who purchased the gift card ending in 4131 appeared to be an older female with gray hair. The elderly female purchasing the gift card ending in 4131 paid in all cash and appeared to be holding her cellphone up to her ear while she made the purchase.

111. Further research by Walmart revealed that the female purchased a second $500.00 gift card in the same transaction. Additionally, the same female conducted three separate transactions over the course of approximately five minutes, purchasing a total of eight gift cards, totaling approximately $4,000.00. Based on the elderly female's irregular gift card purchase activity, in conjunction with her being on the phone while in the store, law enforcement believes she was a victim of a common telephone scam where victims are instructed to purchase gift cards and read the number on the gift cards over the phone after purchase.

112. Concord police then conducted a search on Target Device 6 to locate any information on card number 6306946784834131. A detective located a WeChat thread that appeared to have started in August of 2023 and had 14 listed participants, including WU and JIANG.

113. Concord police used a translator application as well as the basic translation package associated with Cellebrite mobile forensic software to translate messages from Mandarin to English. Based on the rough translation, it appeared the WeChat thread primarily involved sharing gift card numbers.

114. An unidentified WeChat user sent WU gift card number 6306946784834131. WU responded with the exact same number.

115. Based upon the pattern of the conversation within the WeChat thread, law enforcement believes that when WU replies with the gift card number or numbers originally sent by the unidentified user, she is confirming that she and her co-conspirators will be utilizing those gift cards.

116. In a separate WeChat conversation, shortly after WU confirmed the gift card number ending 4131, she sent that same card number to M. CHEN and JIANG.

117. Walmart discovered and provided law enforcement with three additional gift card numbers that were used in separate transactions to purchase electronic products at the same Concord, NH Walmart store, also on December 13, 2023. The three gift card numbers were identified as: 6308581255266637; 6308581255251008; and 6208366113920727.

118. Walmart determined that the gift card ending in 0727 was purchased in Murphysboro, IL on December 13, 2023, in a cash transaction. This gift card was found on Target

Device 6 in a WeChat message thread where WU sent the gift card number to others, including M. CHEN and JIANG.

119. Walmart also determined that the cards ending in 6637 and 1008 were purchased in Vancouver, WA on December 13, 2023, by a woman named "Ingrid Schumaker." A debit card in Schumaker's name was used to conduct the transaction. Each of these gift cards were in the amount of $500.00.

120. The cards ending in 6637 and 1008 were sent in a WeChat group message on Target Device 6. JIANG was included in this group thread.

121. On February 14, 2024, law enforcement continued the search on the forensic extraction on Target Device 6 and observed another separate WeChat conversation between WU, JIANG, and several other unidentified individuals. The contents of the group thread appeared to be for the exclusive purpose of purchasing gift card numbers.

122. Law enforcement observed several messages that were exchanged on October 19, 2023, where an unknown individual sent 35 gift card numbers along with corresponding PIN numbers to access the balance of the gift cards. The sender noted the value of each gift card was $200 for a total of $7,000 in value.










123. As a basis for comparison, law enforcement reviewed the gift cards determined to be fraudulently derived from the cyber-attack on the Victim Company. Law enforcement discovered that all 35 gift card numbers were from the cyber-attack and were used on October 19, 2023, by M. CHEN, X. CHEN, JIANG, and the UAM at the Target retail store located at 203 S Broadway, Salem, NH (described above in ¶ 23).

124. On February 21, 2024, law enforcement spoke with Ingrid Schumaker via telephone. Ms. Shumaker confirmed that she was scammed via telephone. Ms. Schumaker said an individual with "an accent" instructed her to purchase several gift cards. Ms. Schumaker said that the person on the phone became aggressive when she began to doubt their legitimacy.

125. On February 23, 2024, the Concord police obtained a warrant to arrest WU.

126. On February 29, 2024, HSI learned that WU had booked an outbound flight from JFK Airport in New York to South Korea aboard Korean airlines flight KE 86, after midnight on March 3, 2024. WU had a final destination of Shanghai, China.

127. On March 2, 2024, HSI agents and NYPD officers arrived at JFK Terminal 1. At approximately 9:55 PM, WU and JIANG were observed inside the JFK Terminal 1 departure section with multiple suitcases entering the line for the Korean Air check-in counter.

128. Both WU and JIANG were approached by HSI and NYPD. Both individuals were identified and placed under arrest.

129. WU was found to be in possession of a silver Apple iPhone in a clear case, IMEI: 359719534660500 (hereinafter, Target Device 29)

130. JIANG was found to be in possession of two phones, a white Apple iPhone in a grey case (hereinafter, Target Device 30) and black iPhone with a cracked screen with no case (hereinafter, Target Device 31).

131. On April 15, 2024, Concord police obtained a warrant to arrest REN.

132. On May 24, 2024, HSI and the Concord Police Department assisted Customs and Border Protection (CBP) and the Massachusetts State Police (MSP) with executing a New Hampshire state arrest warrant on Jinbin REN at Boston Logan Airport.

133. REN was taken into custody without incident by CBP officers following his arrival from Beijing on board flight Hainan HU 729. REN was later turned over to MSP on a full extradition warrant.

134. Through an earlier search of Target Device 1, which again is a phone belonging to M. CHEN, and a review of a law enforcement database, law enforcement identified phone numbers associated with M. CHEN, X. CHEN, WU, and JIANG.

135. Law enforcement then obtained toll records via subpoena for the phone numbers known to be associated with M. CHEN ([redacted]), X. CHEN ([redacted]), WU ([redacted]), JIANG ([redacted]), and REN ([redacted]).

136. Toll records show that M. CHEN, X. CHEN, WU, JIANG, and REN were in communication in the months prior to their arrest and / or fleeing the country. Although law enforcement is not certain at this time which phone number belongs to which device, the toll records indicate that:

i. JIANG had over 2,700 calls with WU between January 1, 2023, and February 4, 2024.

ii. JIANG had over 1,700 calls with M. CHEN between December 31, 2022, and December 29, 2023.

iii. JIANG had approximately 132 calls with X. CHEN between July 23, 2023, and December 26, 2023.

iv. JIANG had approximately 656 calls with REN between December 31, 2022, and January 10, 2024.

v. M. CHEN had over 300 calls with WU between May 25, 2023, and December 29, 2023.

vi. M. CHEN had 3 calls with X. CHEN between September 26, 2023, and November 12, 2023.

**PROBABLE CAUSE TO BELIEVE THAT THE TARGET DEVICES CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES**

137. Based on my training, experience, and research, I know that the TARGET DEVICES have multiple capabilities. Cellular phone devices in particular (Target Devices 1, 2, 4, 6, 7, 9, 10, 12, 13, 14, 15, 21, 22, 23, 24, 28, 29, 30, 31) can serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. The laptop devices and computer tower (Target Devices 3, 5, 8, 11, 20, 25, 26, and 27) function as computers. The USB flash drives function as a device that stores electronic data (Target Devices 16, 17, 18, and 19). In my training

and experience, examining data stored on devices of these types can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

138. The facts set forth above provide probable cause to believe that M. CHEN, X. CHEN, WU, JIANG, and REN have been involved in a scheme or schemes involving gift cards that were fraudulently obtained or that contained proceeds of other crimes over the course of several months. The individuals above used these TARGET DEVICES to communicate with each other and with others yet unknown who were also involved in the Target Offenses, to store records relating to the scheme (see, e.g. Target Device 12, par. 85), and to run programs that assisted with furthering the scheme (see, e.g. Target Device 3, par. 59).

139. Also, given that the operation at 50A Northwestern Drive in Salem was similar to that of a business, there is probable cause to believe that some of the devices will contain extensive records of the Target Offenses. Based on my knowledge, training and experience, I know that businesses and businesspeople often retain correspondence, financial, transactional, and other business records for years to identify past customers and vendors for potential future transactions, keep track of business delas, monitor payments, debts, and expenses, resolve business disputes stemming from past transactions, prepare tax returns and other tax documents, and engage in other business -related purposes.

140. Specific to the Target Offenses surrounding the cyberattack of the Victim Company, there is probable cause to believe that M. CHEN, X. CHEN, JIANG, and another UAM used mobile phones to redeem gifts cards from the cyberattack in October 2023, and there is evidence that WU, JIANG, and others communicated about gift card numbers connected to the cyber attack. In addition, given the rapidity in which the gift cards were issued, disseminated, and

redeemed across country, there is probable cause to believe that computers/phones and other electronic devices were used to facilitate, communicate, and execute the Target Offenses.

141. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

142. There is probable cause to believe that things that were once stored on the TARGET DEVICES may still be stored there, for at least the following reasons:

i. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

ii. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

iii. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer

has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

iv. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

143. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described in the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the premises or on persons described in Attachments A-1 through A-31 because:

i. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage

medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which the computer created them, although it is possible for a user to later falsify this information.

ii. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when someone accessed or used the computer or storage media. For example, as described herein, computers typically contain information that log: computer user account session times and

durations, computer activity associated with user accounts, electronic storage media that connected with the computer and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's intent as it relates to the offenses under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

iii. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

iv. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records sought, a review team cannot always readily review computer evidence or data in order to pass it along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

v. Further, in finding evidence of how a person used a computer, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

144. Based upon my training and information relayed to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including, for example, external and internal hard drives, flash drives, micro SD cards, cellular phones capable of storage, and online or offsite storage servers maintained by corporations, including but not limited to "cloud" storage. I also know that

during the search of the premises it is not always possible to search computer equipment and storage devices for data for a number of reasons, including the following:

i. Searching computer systems is a highly technical process, which requires specific expertise and specialized equipment. There are so many types of computer hardware and software in use today that it is impossible to bring to the search site all of the technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with computer personnel who have specific expertise in the type of computer, software, website, or operating system that is being searched;

ii. Searching computer systems requires the use of precise, scientific procedures, which are designed to maintain the integrity of the evidence and to recover "hidden," erased, compressed, encrypted, or password-protected data. Computer hardware and storage devices may contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Since computer data is particularly vulnerable to inadvertent or intentional modification or destruction, a controlled environment, such as a law enforcement laboratory, is essential to conducting a complete and accurate analysis of the equipment and storage devices from which the data will be extracted. Further, the examination may employ techniques that would damage or destroy the device, but result in a forensically sound copy of data stored on the device;

iii. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of the premises; and

iv. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a computer user can conceal text in an image file which cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is contraband, evidence, fruits, or instrumentalities of a crime.

145. As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each TARGET DEVICE was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the TARGET DEVICES because:

146. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). With respect to the laptop devices in particular, virtual memory paging systems can leave traces of information on the storage medium

that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

147. The TARGET DEVICES are currently in the lawful possession of HSI. As set forth above, the TARGET DEVICES came into HSI's possession because they were taken during the execution of warrants (Target Devices 1 - 27), a border search (Target Device 28), or seized incident to arrest (Target Devices 29-31). Therefore, while HSI might already have all necessary authority to examine the TARGET DEVICES, I seek this additional warrant out of an abundance of caution to be certain that an examination of the TARGET DEVICES will comply with the Fourth Amendment and other applicable laws.

148. The TARGET DEVICES are currently in storage at 275 Chestnut Street, Suite 307, Manchester, NH 03101. Based on my training and experience and the training and experience of law enforcement personnel who routinely handle this equipment, I understand that the TARGET DEVICES have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the TARGET DEVICES first came into the possession of HSI.

149. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the TARGET DEVICES consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might

expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

150. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

151. Accordingly, there is probable cause to believe that the TARGET DEVICES contain evidence, fruits, and instrumentalities of the Target Offenses, as set forth in Attachment B.

## CONCLUSION

152. Based on the foregoing, I respectfully request that the Court issue the proposed search warrant authorizing the search of all "Target Devices" described in Attachments A-1 through A-31 for the evidence described in Attachment B.

/s/ Christopher Dolan
Christopher Dolan
Special Agent
Homeland Security Investigations

Sworn to before me via telephone in accordance with Fed. Rule Crim. P. 41
on October _1__, 2024.

/s/ Talesha L. Saint-Marc
HONORABLE TALESHA L. SAINT-MARC
UNITED STATES MAGISTRATE JUDGE

# **ATTACHMENT A-1**

*Property to be Searched*

The property to be searched is an Apple iPhone in a gold-colored case, S/N: XVWL2F7HRW, that was seized from Ming Dong CHEN prior to his arrest on December 29, 2023 (Target Device 1).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-2

*Property to be Searched*

The property to be searched is a blue iPhone, S/N: MCFG24XFV0, that was seized from the center console of Ming Dong CHEN's white Mercedes sedan with license plate KZH8797 on January 3, 2024 (Target Device 2).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-3

*Property to be Searched*

The property to be searched is a silver-colored Lenovo laptop, S/N# MP2L6KMA which was seized from 18 Harbor Avenue, Unit #312, Nashua, NH 03060 on January 4, 2024 (Target Device 3).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# **ATTACHMENT A-4**

*Property to be Searched*

The property to be searched is a white Apple iPhone in a purple case, S/N: G0NF63MC0D45, which was seized from 18 Harbor Avenue, Unit #312, Nashua, NH 03060 on January 4, 2024 (Target Device 4).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-5**

*Property to be Searched*

The property to be searched is a black MSI Gaming Laptop, S/N GP72QF495USK1603000445, which was seized from 18 Harbor Avenue, Unit 312, Nashua, NH 03060, on January 4, 2024 (Target Device 5).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-6

*Property to be Searched*

The property to be searched is a white Apple iPhone in a case with a dog pictured on it, S/N: D4NR6G39KK, which was seized from 18 Harbor Avenue, Unit 312, Nashua, NH 03060, on January 4, 2024 (Target Device 6).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-7

*Property to be Searched*

The property to be searched is a white Apple iPhone in a black case, which was seized from 18 Harbor Avenue, Unit 312, Nashua, NH 03060, on January 4, 2024 (Target Device 7).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-8**

*Property to be Searched*

The property to be searched is a silver Alienware laptop, model number P120F003, which was seized from 18 Harbor Avenue, Unit 312, Nashua, NH 03060, on January 4, 2024 (Target Device 8).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-9**

*Property to be Searched*

The property to be searched is a Samsung Phone in a white case, S/N: R3CW10WQ3JM, which was seized from 18 Harbor Avenue, Unit 312, Nashua, NH 03060, on January 4, 2024 (Target Device 9).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# <u>**ATTACHMENT A-10**</u>

*Property to be Searched*

The property to be searched is a white Apple iPhone, S/N: G6TFC3QM0D85, which was seized from Jinbin REN at 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 10).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-11**

*Property to be Searched*

The property to be searched is an HP Computer tower, S/N: 2MO3301RL9, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 11).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-12

*Property to be Searched*

The property to be searched is a white Apple iPhone in a gold animal case, S/N: TFY3257YL6, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 12).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-13

*Property to be Searched*

The property to be searched is a white Apple iPhone, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 13).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-14

*Property to be Searched*

The property to be searched is an Apple iPhone in a clear colored case, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 14).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# **ATTACHMENT A-15**

*Property to be Searched*

The property to be searched is a grey colored UMIDIGI cellphone, IMEI: 353479104000699, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 15).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-16

*Property to be Searched*

The property to be searched is a blue USB device, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 16).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# **ATTACHMENT A-17**

*Property to be Searched*

The property to be searched is a blue USB device, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 17).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-18**

*Property to be Searched*

The property to be searched is a blue USB device, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 18).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-19

*Property to be Searched*

The property to be searched is a blue USB device, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 19).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# **ATTACHMENT A-20**

*Property to be Searched*

The property to be searched is a silver HP laptop, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 20).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-21**

*Property to be Searched*

The property to be searched is an Apple Phone, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024, and marked as Concord Police Department Evidence "24-460-PR" (Target Device 21).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## **ATTACHMENT A-22**

*Property to be Searched*

The property to be searched is an Apple iPhone in a mint green case, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 22).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-23**

*Property to be Searched*

The property to be searched is an Apple iPhone in a blue case, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024, and marked as Concord Police Department Evidence "24-455-PR" (Target Device 23).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-24

*Property to be Searched*

The property to be searched is an Apple iPhone in a blue case, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024, and marked as Concord Police Department Evidence “24-456-PR” (Target Device 24).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-25

*Property to be Searched*

The property to be searched is a Gold Dell Laptop, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 25).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-26**

*Property to be Searched*

The property to be searched is a dark colored Asus laptop, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 26).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-27**

*Property to be Searched*

The property to be searched is a dark colored Asus laptop, which was seized from 50A Northwestern Dr Unit 2 Salem, NH 03079 on January 11, 2024 (Target Device 27).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT A-28

*Property to be Searched*

The property to be searched is a white Apple iPhone 13, S/N: M6QHH7DQYQ, which was seized from Jinbin REN at Boston's Logan Airport on January 11, 2024 (Target Device 28).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

**ATTACHMENT A-29**

*Property to be Searched*

The property to be searched is a silver iPhone in a clear case, IMEI: 359719534660500, S/N: CXJR9JN4JM, which was seized from Naxin WU at JFK International Airport on March 2, 2024 (Target Device 29).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# **ATTACHMENT A-30**

*Property to be Searched*

The property to be searched is a white Apple iPhone in a grey case, which was seized from Mengying JIANG at JFK International Airport on March 2, 2024 (Target Device 30).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

## ATTACHMENT A-31

*Property to be Searched*

The property to be searched is a black iPhone with a cracked screen, S/N: DNPY12KTKXKN, which was seized from Mengying JIANG at JFK International Airport on March 2, 2024 (Target Device 31).

The Device is currently in the possession of Homeland Security Investigations and located at the Homeland Security Investigations Manchester, NH office at 275 Chestnut Street, Suite 307, Manchester, NH 03101.

This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

*Property to be Seized*

I. For the time period of January 1, 2023 to the present, all Records, in whatever form that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 1005 (Fraud and related activity in connection with computers); 18 U.S.C. § 1029 (Fraud and related activity in connection with access devices); 18 U.S.C. § 1343 (Wire fraud); 18 U.S.C. §§ 1956, 1957 (money laundering), and 18 U.S.C. § 371 (conspiracy) (together, the "Target Offenses"), including:

a. Records pertaining to the acquisition, purchase, transfer, sale, or advertisement, of gift card account numbers, gift cards, or other stored value card; including those obtained from the cyberattack on the Victim Company;

b. Records related to any storage facility, garage, workshop, or other location where M. CHEN, X. CHEN, WU, JIAN, G, REN (the SUBJECTS) or others may store gift cards or stored value cards, or merchandise acquired through store cards or stored value cards;

c. Records pertaining to the SUBJECTS and any other co-conspirators/potential co-conspirators;

d. Records pertaining to KENCOMPUTERSINC@OUTLOOK.COM; HOLSTEINGAMING@OUTLOOK.COM; RONTECHINCORP@OUTLOOK.COM; and JOSEFTECHANDCO@OUTLOOK.COM;

e. Records related to the SUBJECTS' use of WeChat, WhatsApp, Telegram, Discord, internet chat rooms, and other applications and programs that allow the SUBJECTS

to communicate with others about gift card account numbers, gift cards, and stored value cards;

f. Records and information related to any IP addresses used by the SUBJECTS;

g. Information regarding the SUBJECTS' schedule or travel;

h. Records related to all bank records, account information, money transfer receipts, and all other financial records and proceeds of any sales of gift cards and stored value cards;

i. Records related to the disposition, movement, shipping and/or current location of any items purchased using gift cards.

II. For any computer equipment called for by this warrant or that might contain things otherwise called for by this warrant:

a. evidence of who used, owned, or controlled the computer equipment;

b. evidence of the presence or absence of malicious software that would allow others to control the items, and evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other computer hardware or storage media;

d. evidence of counter forensic programs and associated data that are designed to eliminate data;

e. evidence of when the computer equipment was used;

f. passwords, encryption keys, and other access devices that may be necessary to access the computer equipment;

g. records and tangible objects pertaining to accounts held with companies providing Internet access or remote storage; and

*DEFINITIONS*

For the purpose of this warrant:

A. "Computer equipment" means any computer hardware, computer software, mobile phone, storage media, and data.

B. "Computer hardware" means any electronic device capable of data processing (such as a computer, smartphone, cell/mobile phone, or wireless communication device); any peripheral input/output device (such as a keyboard, printer, scanner, monitor, and drive intended for removable storage media); any related communication device (such as a router, wireless card, modem, cable, and any connections), and any security device, (such as electronic data security hardware and physical locks and keys).

C. "Computer software" means any program, program code, information or data stored in any form (such as an operating system, application, utility, communication and data security software; a log, history or backup file; an encryption code; a user name; or a password), whether stored deliberately, inadvertently, or automatically.

D. "Storage media" means any media capable of collecting, storing, retrieving, or transmitting data (such as a hard drive, CD, DVD, or memory card).

E. "Data" means all information stored on storage media of any form in any storage format and for any purpose.

F. "A record" is any communication, representation, information, or data. A "record" may be comprised of letters, numbers, pictures, sounds or symbols.

*RETURN OF SEIZED COMPUTER EQUIPMENT*

If the owner of the seized computer equipment requests that it be returned, the Government will attempt to do so, under the terms set forth below. If, after inspecting the seized

computer equipment, the government determines that some or all of this equipment does not contain contraband or the passwords, account information, or personally-identifying information of victims, and the original is no longer necessary to retrieve and preserve as evidence, fruits or instrumentalities of a crime, the equipment will be returned within a reasonable time, if the party seeking return will stipulate to a forensic copy's authenticity (but not necessarily relevancy or admissibility) for evidentiary purposes.

If computer equipment cannot be returned, agents will make available to the computer system's owner, within a reasonable time period after the execution of the warrant, copies of files that do not contain or constitute contraband; passwords, account information, or personally-identifying information of victims; or the fruits or instrumentalities of crime.

For purposes of authentication at trial, the Government is authorized to retain a digital copy of all computer equipment seized pursuant to this warrant for as long as is necessary for authentication purposes.